## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| JOHNNY RAY PETERSON,<br><br>                    Plaintiff,<br><br>vs.<br><br>TRANS UNION, LLC,<br><br>                    Defendant. | Case Action No.: 6:23-cv-00617<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Johnny Ray Peterson ("Plaintiff" or "Mr. Peterson") a living, breathing 67-year-old consumer, brings this action on an individual basis, against Trans Union, LLC ("Trans Union" or "Defendant") and states as follows:

### INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for

misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and

> unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.      The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

3

11.     Plaintiff's claims arise out of Defendant's blatantly inaccurate credit reporting, wherein Defendant Trans Union reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12.     Accordingly, Plaintiff brings claims against Defendant Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

14.     Johnny Peterson ("Plaintiff" or "Mr. Peterson") is a natural person residing in Waco, Texas, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the State of Texas, including within this District.

16.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

**A.      Summary of the Fair Credit Reporting Act**

19.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to

5

ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**B.     Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

24.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

25.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant Trans Union, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

27.     Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

28.     Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

6

29.     Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

30.     Defendant does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31.     Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32.     In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to it to be placed in said consumer's credit file or report.

33.     Defendant regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Defendant does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

34.    Defendant will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

35.    Defendant fails to employ reasonable procedures that assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

36.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, the Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

37.    Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

38.    Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

39.    Upon Defendant's reports with a "deceased" mark sold to third parties, Defendant never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

40.    Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

41.    Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

42.     Defendant knows that living consumers are routinely turned down for credit specifically because it is reporting them as "deceased" and without a credit score.

43.     Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the Defendant is inaccurately reporting them as "deceased" and without a credit score.

44.     Defendant has received and documented many disputes from consumers complaining that Defendant had erroneously marked them as "deceased" on their credit reports.

45.     Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

46.     Nevertheless, Defendant does not employ any procedures to assure that a consumer marked as "deceased" on its credit reports is in fact deceased.

47.     Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance decides to change the code.

48.     Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

49.     Nor does Defendant employs any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

50. For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

51. Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to it—meaning that no one is continuing to purchase reports about that consumer.

52. Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

53. Defendant profits from the sale of reports on deceased consumers.

54. Defendant has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

55. Defendant knows that truly deceased consumers do not apply for credit.

56. Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the Defendant to be a common and major source of identity theft.

57. Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

58. Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

59.     Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

60.     Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

61.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Defendant to sell its credit reports, absent a court order.

62.     Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**C.    Plaintiff Tries to Make a Payment on His Capital One Credit Card**

63.     Plaintiff resides in Waco, Texas, with his wife, where they have resided for the better part of 15 years.

64.     In or about May 2022, Plaintiff tried to make a payment on his Capital One credit card.

65.     Accordingly, Plaintiff tried to sign in his account to make the payment but was unable to do so.

66.     Plaintiff immediately contacted Capital One via telephone to inquire as to why he was unable to access his account.

67.     On the phone with CapitalOne, Plaintiff identified himself to Capital One representative as well as his account at issue.

11

68.    On the phone with CapitalOne Plaintiff explained that he attempted to log in to make a payment on his account but was unable to do so.

69.    The Capital One representative informed Plaintiff that the error was due to him being reported as deceased.

70.    Specifically, the Capital One representative explained that Trans Union was reporting that Plaintiff's Social Security number was associated with someone who had been reported as deceased.

71.    Plaintiff maintained multiple lines of credit with Capital One alone, never mind his multiple other lines of credit, and he feared that his inability to make timely payments to Capital One, or other creditors, would cause to have a significant and detrimental impact on his credit score and credit ability.

**D.    Plaintiff's Dispute to the Defendant Regarding the Inaccurate Credit Reporting in May 2022**

72.    On or about May 23, 2022, extremely shocked, surprised, and embarrassed at the Defendant's inaccurate reporting, Plaintiff called Defendant and disputed the deceased notation that it was reporting on his credit report.

73.    During Plaintiff's phone dispute with Trans Union, Plaintiff provided his full name and Social Security number, and explained that any notation that he was deceased on his credit file was inaccurate as he was alive, evidenced by his phone call, among other things.

74.    During Plaintiff's phone dispute with Trans Union, a representative for Defendant confirmed that there was a deceased notation reporting to Plaintiff's credit file. The Trans Union representative stated in that call that the error was likely due to a clerical error.

75.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

76.     On the same day, May 23, 2022, and as directed by a representative for Defendant Trans Union during his phone dispute, Plaintiff also submitted a letter to Defendant with a copy of his birth certificate and of his Social Security card enclosed, which explained that he was being reported as deceased in error.

77.     Plaintiff never heard back from Trans Union regarding his dispute of the inaccurate deceased notation.

78.     Thereafter, Defendant failed to correct or delete the deceased notation appearing in Plaintiff's credit file.

79.     Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's May 2022 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**E.     Defendant's Method for Considering Consumer Credit Report Disputes**

80.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

81.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

82.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

83.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

84.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

85.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

86.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

87.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

88.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

89.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

90.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**F.      Plaintiff Applies for a Loan with PayPal**

91.     On or about July 10, 2022, Plaintiff applied to PayPal for a "PayPal Pay in 4" personal installment loan, which loans, upon information and belief, are issued by Synchrony Bank.

92.     Plaintiff and his wife needed the loan to make essential repairs and improvements to their home kitchen.

93.     Plaintiff provided PayPal with all of the necessary personal identifiers and information in support of his loan application.

94.     Plaintiff anticipated being approved for the requested loan.

95.     Upon information and belief, on or about July 10, 2023, PayPal and/or Synchrony Bank obtained a copy of Plaintiff's credit file from Defendant in connection with Plaintiff's loan application.

**G.      PayPal Denies Plaintiff's Loan Application**

96.     Upon information and belief, on or about July 10, 2023, Trans Union published to PayPal and/or Synchrony Bank that Plaintiff was deceased.

97.     Specifically, PayPal notified Plaintiff that his application was denied because "the credit report retrieved indicated that the applicant is deceased."

98.     Defendant's publication to PayPal and/or Synchrony Bank that Plaintiff was deceased was inaccurate as Plaintiff was very much alive.

99.     Upon information and belief, as a result of Defendant's inaccurate reporting of a deceased notation on Plaintiff's Trans Union credit file, PayPal denied Plaintiff's loan application.

100.    Thus, Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**H.    Plaintiff Decided to Change his Mobile Operator**

101.    In or about January 2023 Plaintiff decided to change his mobile operator as he was frustrated with the cellphone service quality of his current operator.

102.    At the same time, Plaintiff noticed that T-Mobile, a cellphone service operator, was offering new customers an attractive discount on a superior phone.

103.    Therefore, Plaintiff decided to switch cell providers and upgrade his phone.

104.    Plaintiff anticipated that he would be able to secure credit at favorable conditions such that he would be able to buy a new phone when switching the mobile operator.

105.    On or about January 8, 2023, Plaintiff traveled in person to T-Mobile and applied for a line of credit with which to purchase a new phone.

106.    On the same day, January 8, 2023, T-Mobile obtained a copy of Plaintiff's credit file from Defendant.

**I.    T-Mobile Denies Plaintiff's Credit Application**

107.    Upon information and belief, Defendant's credit report contained a notation stating that Plaintiff was deceased.

108.    Defendant's publication to T-Mobile that Plaintiff was deceased was inaccurate as Plaintiff was very much alive.

109.    As a result of Defendant's inaccurate reporting of a deceased notation on Plaintiff's Trans Union credit file, T-Mobile denied Plaintiff's credit application.

110.    Thus, Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**J.    Social Security Administration Requested Proof That Plaintiff is Alive**

111.    In or around mid-February 2023, Plaintiff received a letter from Social Security Administration ("SSA") stating that he had been reported as deceased and asking him to provide proof that he was alive.

112.    Plaintiff was aghast and shocked at receiving the SSA letter; it appears that Trans Union's malfeasance and purported "error" was spreading and had the potential to fatally disrupt Plaintiff's financial and credit wellbeing, let alone other areas of his life, such as healthcare, and Social Security payments and/or benefits in the future.

113.    On or about February 21, 2023, Plaintiff sent a copy of his birth certificate and of his Social Security card to the SSA.

114.    After further communications with the SSA, by letter dated March 30, 2023, the SSA warned Plaintiff that he must appear, in person, at one of the SSA offices before April 13, 2023, in order for the SSA to "correct or remove the death information on your record."

115.    On or about April 10, 2023, Plaintiff traveled to an SSA office, where confirmed that he was alive.

116.    After seeing Plaintiff was clearly not deceased, and after Plaintiff signed a certification to that effect, the SSA representative assured Plaintiff that the issue would be corrected.

117.    On or about April 27, 2023, Plaintiff received a letter from the SSA confirming that the issue was fixed, and he was no longer being reported as deceased.

118.    However, to Plaintiff's dismay, the SSA letter dated April 27, 2023, further notified that "[b]ecause we incorrectly recorded you as deceased on your Social Security record, we released your information. When we learned of this error, we corrected your record and immediately removed your information from the DMF."

119.    The SSA letter dated April 27, 2023, further notified that the SSA would provide, free of charge, one year of credit monitoring by an independent contractor.

120.    Needless to say, the SSA's letter was not very reassuring, as Plaintiff was essentially informed that multiple government agencies, and potentially others, have already marked in their records that Plaintiff was deceased.

121.    As a result of Defendant's reporting of the "deceased" notation, Defendant made it practically impossible for Plaintiff to continue to obtain credit.

122.    Moreover, the stress associated with Defendant's reporting him as deceased and the consequences therefrom has aggravated Plaintiff's conditions, as he has been diagnosed with Type II diabetes and high blood pressure.

123.    As a result of the significant anxiety and distress caused by Defendant, Plaintiff experienced a loss of appetite and lost about twenty pounds; further, Plaintiff has had trouble sleeping and being attentive and present at work.

124.    As a result of Defendant's reporting of the "deceased" notation and Plaintiff's distress and anxiety caused thereby and Plaintiff's inability to obtain credit, Plaintiff's martial relationship has suffered; further, Plaintiff's spouse has experienced significant stress, which, in turn, exacerbated and contributed to further distressing Plaintiff.

125.    Plaintiff has had prescription drugs' dosage increased as a direct result of the distress he experienced that was caused by Defendant's actions.

126.    Plaintiff is 67 years old and has considered retirement during the past two years. However, as a result of Defendant's reporting of the "deceased" notation, Plaintiff could not fathom actually retiring and collecting Social Security payments at a time when the Social Security Administration considered him to be deceased.

127.    After the SSA purported to correct its reporting, Plaintiff ultimately determined that he would continue working, for now, and postpone retirement for a time. However, Plaintiff's inability to make that determination during much of 2022 and early 2023 was extremely disconcerting and humiliating to Plaintiff and also deprived him of the agency to make his own life decisions about matters as important as how to spend his days.

128.    Still today, Plaintiff does not know if and when Trans Union will decide to inform the SSA that he is deceased, and potentially force Plaintiff to restart the process of proving that he is not dead all over again.

129.    Indeed, still today, Plaintiff experiences significant stress and anxiety whenever he is about to make a larger purchase, considering as he does not know when any system or person will tell him that he is deceased. As a result, Plaintiff tries to pay using cash whenever possible.

130.    At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

131.    At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

132.    As a standard practice, the Defendant does not conduct independent investigations in response to consumer disputes. Instead, it merely parrots the response of the credit furnisher

despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

133.    Defendant is aware of the shortcomings of its procedures and intentionally chose not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

134.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendant Trans Union)

135.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

136.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

137.    On at least one occasion, Defendant Trans Union prepared patently false consumer report concerning Plaintiff.

138.    Despite actual and implied knowledge that Plaintiff is not dead, Defendant Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

139.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

140.    As a result of the Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

141.    Defendant Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

142.     Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendant Trans Union)

143.     Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

144.     The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

145.     The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

146.     On at least one occasion during 2022, Plaintiff disputed the inaccurate information with Trans Union and requested that it correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to his, namely, stating that he is "deceased."

147.     In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

148.     Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the

22

30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

149.    As a result of the Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

150.    Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

151.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

a)    Determining that Defendant negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

d)      Granting further relief, in law or equity, as this Court may deem appropriate and

just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: August 21, 2023,                */s/ Levi Y. Eidelman*
                                        Levi Y. Eidelman, NY Bar No. 5742499
                                        **CONSUMER ATTORNEYS**
                                        300 Cadman Plaza West, 12th Floor, Suite 12049
                                        Brooklyn, New York 11201
                                        Telephone: (718) 360-0763
                                        Email: leidelman@consumerattorneys.com

                                        *Attorneys for Plaintiff Johnny Ray Peterson*